THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JULIO MARTINEZ, Defendant-Appellant.

First District (2nd Division)    No. 1—99—0553

Opinion filed November 27, 2002.

Michael J. Pelletier and Erin Stone, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

## SUPPLEMENTAL OPINION[1]

JUSTICE BURKE delivered the supplemental opinion of the court:
This case is before us for a second time. Defendant Julio Martinez

---

[1]An opinion was issued in this matter on December 6, 2000. We remanded the cause to the circuit court, but we retained jurisdiction. The cause is before us after remand, and therefore this supplemental opinion is being issued.

was convicted of three counts of aggravated criminal sexual assault and one count of armed robbery and was sentenced to 12 years' imprisonment on each of the three convictions for aggravated criminal sexual assault and 6 years' imprisonment for armed robbery, to be served consecutively. Defendant appealed, challenging the jury selection and we held that the trial court failed to conduct the third step of the *Batson* analysis. Accordingly, we remanded the cause to the circuit court for the limited purpose of conducting a proper *Batson* analysis. *People v. Martinez*, 317 Ill. App. 3d 1040, 740 N.E.2d 1185 (2000). Defendant now appeals from the order of the circuit court entered on remand, finding that the State's reason for excluding a minority juror was not motivated by race and that defendant failed to meet his burden of proving purposeful discrimination. On appeal, defendant contends that the State's reason for excluding the juror was motivated by discrimination and that the trial court erred in not confining its findings on remand to the record made at the time of defendant's trial. Defendant also contends that the trial court erred in denying him his right to present a defense by limiting cross-examination of a key State witness, in providing the jury with verdict forms that contained the term "victim," and that his consecutive sentences violate *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).[2] For the reasons set forth below, we affirm.

## STATEMENT OF FACTS

We repeat those facts set forth in our original opinion that are necessary to the resolution of defendant's *Batson* claim. Defendant was charged with numerous counts of aggravated criminal sexual assault, armed robbery, kidnaping, and aggravated battery, based upon events that occurred on February 26, 1997. Prior to trial, defendant filed a motion to suppress, contending that his pretrial statement was the result of physical, psychological, and mental coercion and, therefore, was involuntary. In an amended motion to suppress, defendant alleged that he was struck about the body and head by unknown detectives with their fists, and that he was deprived of sleep.

On August 26, 1998, the trial court conducted a hearing on defendant's motion to suppress his statement. Following testimony from Detective Robert Collins, Assistant State's Attorney Jeff Neslund, and defendant, the court denied the motion. The trial court specifically stated that defendant was not a credible witness. After reviewing all of the testimony presented, the trial court concluded that defendant had been given his *Miranda* warnings, he was not assaulted, and

---

[2]We retained jurisdiction in our original opinion to address these issues following remand of this cause.

Neslund did not simply present the statement to defendant and tell him to sign it. Therefore, the court ruled that defendant knowingly and intelligently gave his statement.

Jury selection began on November 30, during which the State, using a peremptory challenge, excused Leanna Lee, a black female, approximately 65 years old. Lee had stated that she had no hobbies and read the Chicago Sun Times, Chicago Tribune, Defender, Jet, and Ebony. Defendant objected to the State's challenge, arguing that the State was striking all minorities. When asked by the trial court for a reason for excusing Lee, the State responded that it was excusing her because "[s]he indicated one of the publication[s] she is [sic] likes to read is the Defender. Based on that representation, we ask to excuse her." The trial court found the State's reason to be race-neutral. Defendant then argued that the Defender was like any other newspaper—"it shows facts and gives facts." According to defendant, excusing Lee on this basis was like excusing any other juror because he or she read the Tribune. Defendant therefore maintained that the State's reason was not race-neutral. The trial court then again found that the State's reason was race-neutral, stating it is "race neutral if it [is] not based upon race."

With respect to defendant's other claims, we repeat only those facts necessary to our resolution of these issues. At trial, M.L., the victim, testified with respect to the events that occurred on February 26, 1997, as well as the fact that she was taken to the hospital for an examination following an interview by the police.

Peggy Lee, a registered nurse, testified that she was working in the emergency room on February 26. She stated that she had seen approximately 50 victims of sexual assault over the years. On February 26, Lee saw M.L. at approximately 10 p.m., at which time M.L. told her what had happened. Lee testified that M.L. was not able to give a detailed version of the events because she was tearful, very sad, and seemed depressed. M.L. would not make direct eye contact with Lee. Dr. Scott Betzelos performed an examination of M.L. Additionally, a sexual assault kit was made. M.L.'s underpants were retained and swabs were taken from her mouth, vaginal area, and rectal area. Lee stated that she did not observe any injuries or trauma to M.L.'s body, but "[t]hat this was not uncommon." Lee further stated that there were no injuries or trauma to M.L.'s vaginal or rectal area, again stating that this was "not at all" uncommon.

When asked how many of the 50 plus victims of sexual assault she had examined had injury to the vaginal area, Lee stated that there were "very few, maybe 5 or less." With respect to injuries to the rectal area, she stated, "Very few." She also stated that very few of the

individuals she had seen had injuries, lacerations, bruises, or abrasions to the body.

On cross-examination, Lee testified that she was not at the scene with any of the 50 plus victims. She stated that when they arrived at the hospital, they told her their complaints. When asked if she knew whether the complaints were truthful or not, Lee stated, "I don't know what happened prior to their admission to the emergency room." Lee further admitted that of the cases she had seen, she did not know how many involved forcible penetration.

Cecelia Doyle, a superintendent for the Illinois State Police Forensic Center, conducted DNA testing. She compared defendant's DNA sample to the sperm found on the swabs taken from M.L. and her underpants. The DNA profile from M.L.'s vaginal swab matched the DNA profile of defendant as did the rectal swab. Doyle stated that, to a reasonable degree of scientific certainty, the semen was consistent with having originated from defendant. On cross-examination, Doyle testified that there was no way to tell from DNA whether sex had been forced. The State rested and defendant's subsequent motion for a directed finding was denied.

Defendant then called Dr. Betzelos to establish his consent defense. Betzelos was an attending emergency room doctor. He stated that he had approximately 5 to 10 alleged sexual assault cases per year and, in his history, had himself seen approximately 50 plus individuals. He further stated that he examined M.L. after she had been seen by Lee. According to Betzelos, the nurses perform their own physical assessment of a patient in addition to the doctor's examination. Upon examination, Betzelos did not find any bumps, bruises, or abrasions on M.L.'s body, nor did he find any type of defense wounds. Betzelos also stated that one does see injuries such as bumps, bruises, and abrasion in sexual assault cases but "not all cases."

Dr. Betzelos further stated that when he examined M.L., he probably assumed she had been on cement because his notes indicated she was in a gangway. He testified that he found no signs of trauma, and no cuts or tears to the vagina. Although Betzelos did not conduct an internal rectal examination, he found no signs of trauma outside. Additionally, Betzelos did not notice any bruises or scrapes on M.L.'s buttocks or redness on the backs of her legs. Betzelos testified that when a sexual assault victim is on cement "you can see injuries. Sometimes you can't, more likely than not you can."

On cross-examination, Dr. Betzelos testified that M.L. was depressed. He further stated that it would not be uncommon for an individual not to suffer trauma in the vaginal or rectal area if she submitted to the sexual assault. Betzelos further stated that it was

less likely that one would suffer injuries if she submitted. When questioned regarding the likelihood of injuries on wet versus dry cement, Betzelos stated, "Water would certainly reduce friction and therefore reduce injury." According to him, if one's buttocks or knees were placed on wet concrete, abrasion would less likely occur. Betzelos then testified it would be consistent with an individual who did not resist not to have defense wounds.

On redirect examination, Dr. Betzelos testified that it was more likely than not that one would see injuries in forced anal penetration. However, on re-cross-examination, he testified that an individual was less likely to suffer injury in the rectal area if she submitted.

In rebuttal, the State called Assistant State's Attorney Neslund. Neslund testified that on March 6, 1997, he took defendant's statement after he advised defendant of his rights. Prior to speaking with defendant, Neslund had reviewed the police reports and spoken to M.L. According to Neslund, Detective Collins was with him when defendant was interviewed. Neslund talked with defendant for one-half hour, then asked defendant if he wanted to memorialize his statement, to which defendant replied, "Yes." Neslund then wrote the statement out. When he was finished, he went through the statement with defendant and allowed defendant to make corrections. Neslund then published defendant's statement to the jury.

The jury returned guilty verdicts on three counts of aggravated criminal sexual assault and one count of armed robbery. Defendant was sentenced to 12 years' imprisonment on each of his three convictions for aggravated criminal sexual assault and 6 years' imprisonment for armed robbery, to be served consecutively.

Defendant appealed and we remanded the cause, finding that the trial court failed to conduct the third step of the *Batson* analysis. On remand, Assistant State's Attorney Michael Falagario was questioned by the court and the following colloquy occurred:

"THE COURT: What is your reason for excluding [Lee] based upon her reading of the Defender?

MR. FALAGARIO [Assistant State's Attorney]: As you know, there was a motion to suppress statements in this case that was litigated.

During that motion the defendant Julio Martinez testified on August 26th of 1998.

He testified and the motion stated that the defendant was struck about his body and head by detectives with their fists, that he was deprived of sleep and that he was told if he did not sign [t]he handwritten statement he would go to jail for the rest of his life.

That motion was litigated. There was testimony from the defendant as well as the Chicago Police Department.

The motion was denied.

The reason I stated the Defender newspaper is that Ms. Lee indicated that she read at the time—my thought process at that time was that the Defender I was aware had been in the past critical of the police, that there was the potential that police officers would testify and they did in fact testify and that these allegations of coercion would be brought to the attention of the jury.

It is also my knowledge and I was aware that the [D]efender had published articles regarding police brutality and specifically regarding police brutality in the context of coerced confessions being taken from defendants in custody in the Chicago Police Department.

My position at the time was that Mrs. [sic] Lee reading the Defender and possibly reading the articles or article regarding that may have influenced her in some manner and that influence may have prejudiced the prosecution in this case.

For that reason, we felt that she would not or may not be a fair juror in the cause and we exercised our right to use a peremptory challenge.

As you recall, the handwritten statement was introduced into evidence during the trial and there was testimony during the trial and it was our feeling based on her representations that she may not be a fair juror."

The trial court then allowed defendant's attorney to comment and make argument. Defendant's attorney argued that the Defender was a mainstream, major newspaper that happened to be read by a majority of blacks. He argued that it was no different than the Tribune or Sun Times, which had also published articles about police brutality, and that those individuals who read those publications, unlike Lee, were not excused. Defense counsel also argued that the new basis asserted by Falagario was outside of that heard at the original trial. It was his position that the State's reason based on the publication of articles about police brutality in the Defender, a mainstream newspaper, was just a front for discrimination by the State. Following the State's argument and additional argument by defendant's attorney, the trial court took the matter under advisement.

The trial court, in a subsequent order, found that defendant failed to meet his burden of proving that the State had engaged in discrimination in exercising its peremptory challenge against Lee. In reaching its conclusion, the trial court first detailed and considered what transpired in connection with defendant's motion to suppress his statement and the testimony offered at the hearing on the motion. The court then detailed defendant's defense at trial, consent, and the testimony offered by defendant to establish this defense, as well as the

testimony offered by the State to rebut defendant's defense, including defendant's statement. The trial court then detailed its history with Falagario, particularly noting that he had participated in two other jury trials at which no allegations of *Batson* violations were made. The court then stated, "[b]ased upon this court's experience with Mr. Falagario, this court finds there has been no prior evidence of any purposeful discriminatory practices carried out by Mr. Falagario."

The court then found that the Defender was a mainstream newspaper, aimed toward the black community, and, after noting that the court was familiar with the Defender, stated that it "believes the Defender has historically been more critical of the actions of the police than the Chicago Tribune or the Chicago Sun Times when issues concerning police brutality and police tactics utilized in the obtaining of confessions from a defendant while they are in custody are raised." The court then found that, "[b]ased upon the totality of the circumstances, *** an issue concerning police coercion of a confession existed in this case" and the "State had no reason to believe Defendant would not take the stand to testify at trial. The State could reasonably believe that Defendant would make the same allegations to the jury that he made at the hearing on the motion to suppress." The court concluded:

> "Assistant State's Attorney Michael Falagario's [*sic*] [was] credible and that his reason for excluding Ms. Leanna Lee was not based upon a motivation to exclude her based upon her race. This court finds his reason to exclude Ms. Lee was race-neutral. The State can have a legitimate concern that a juror would possibly not be receptive to the State's evidence concerning the taking of a confession and the confession itself based upon the possibility that a juror has been exposed to a newspaper perceived as critical to the method and manner in which police deal with defendants in custody. This court also finds it significant that two African-Americans were accepted by the State and did serve on the jury. These jurors indicated that they frequently read publications with a predominantly African-American audience. *** [Accordingly], this court finds the Defendant has not met his burden of proving purposeful discrimination by the State in their exercise of their peremptory challenge to Ms. Leanna Lee."

This appeal followed.

## ANALYSIS

### I. Peremptory Challenge

■ Defendant first contends that the trial court erred in failing to confine its findings on remand to the record made at the time of

defendant's trial, rather than allowing the State to amplify and expand on its reason upon remand. Defendant also argues that the trial court erred in relying on the fact that two other black jurors were seated on his jury. According to defendant, this fact is irrelevant since no one knew at the time Lee was excused that two other blacks would sit on the jury. Defendant asks this court to remand again for a proper *Batson* hearing based on the record as it existed at the time of his trial.

Although we stated in our remand order that the trial court was to conduct the proper *Batson* analysis "based on the record as it now exists," and defendant focuses upon this, we do not find this statement determinative, as defendant argues. We did not intend, nor did we believe, that additional arguments could not be made by both parties. Our intent in making the statement, rather, was to limit the State's basis to that offered at defendant's trial and not to allow it to assert a new, different reason for its excusal, *e.g.*, because Lee had red hair and wore sunglasses. It is clear that the trial record was incomplete at the time of our original decision because the trial court stopped its analysis at the second *Batson* stage. It failed to proceed to the third stage where it was to consider the arguments of the parties, assess the genuineness of the reason, and weigh the evidence. Such analysis, which is required by *Batson*, was not contained in the original trial record. Accordingly, we do not find defendant's argument that the trial court was limited to the original trial record persuasive since, as we acknowledged in our original decision, the record was inadequate for us to determine whether the State's reason was pretextual or not. See 2A Ill. L. & Prac. *Appeal & Error* § 668, at 424-25 (2002) (a reviewing court has the power to remand where the record is not in a condition for the reviewing court to decide the issue presented or where all of the evidence on the issue was not presented).

Further support for our a conclusion is found in those cases, although not exactly like the instant case, where no reason was given at the defendant's original trial for excusing certain jurors and the cause was remanded for a *Batson* hearing. See, *e.g.*, *People v. Pecor*, 286 Ill. App. 3d 71, 81, 675 N.E.2d 141 (1996); *People v. Nunn*, 273 Ill. App. 3d 519, 520, 652 N.E.2d 1146 (1995). In those cases, the State was allowed to reconstruct its reasons and thought processes upon remand and to state a basis for its excusal. *Nunn*, 273 Ill. App. 3d at 524. See also *People v. Trujillo*, 15 P.3d 1104, 1106-07 (Colo. App. 2000) (allowing the prosecutor to give race-neutral reasons upon remand beyond those given at the defendant's trial). We also reject defendant's argument that there is no relevancy that two other black jurors sat on defendant's jury, as discussed below.

Defendant next contends that he should be granted a new trial

because the explanation given by the State for excusing Lee was pretextual. This is true, according to defendant, because the State had given very specific reasons for other challenges at his trial, it accepted nonminority jurors who read publications with articles about police brutality, and it gave a new or expanded reason on remand for excusing Lee. Thus, defendant maintains that the State's reason with respect to Lee and the Defender was pretextual. Defendant also maintains that originally the State said nothing about the Defender being critical of police, nor that it published articles about police brutality and confessions. According to defendant, the State only made this comment 2¹/₂ years after defendant's trial. Defendant further states that the State never explained at defendant's trial why reading the Defender would make an individual undesirable and it did not remove nonminority jurors who read articles in the Tribune which concerned police brutality. Defendant again argues that the fact that the State did not strike two other black jurors who read publications directed at blacks is not relevant to whether the State had a discriminatory intent with respect to Lee because these jurors were seated after defendant made his *Batson* challenge and the State may well have concluded that it was best not to exclude any more black jurors.

■ As set forth in our original decision, at the third stage of the *Batson* analysis, the trial court "weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the venireperson, and any rebuttal by defense counsel. [Citation.] The court must determine whether the defendant has met his or her burden of proving purposeful discrimination." *People v. Easley*, 192 Ill. 2d 307, 324, 736 N.E.2d 975 (2000). It is at this step "that the persuasiveness of the justification becomes relevant" (*Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995)), and the trial court must assess the genuineness of the State's explanation along with the State's credibility in offering the explanation (*Nunn*, 273 Ill. App. 3d at 525). The trial court is free to consider all the circumstances of the trial, evaluate the prosecutor's credibility, and reexamine the explanation offered by the State. *People v. Crockett*, 314 Ill. App. 3d 389, 397, 731 N.E.2d 823 (2000). "The trial court must make ' "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case." ' " *People v. Fair*, 159 Ill. 2d 51, 72, 636 N.E.2d 455 (1994), quoting *People v. Harris*, 129 Ill. 2d 123, 174-75, 544 N.E.2d 357 (1989), quoting *People v. Hall*, 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75 (1983). The trial court's determination is afforded great deference and we will not reverse its determination unless it is clearly erroneous. *Crockett*, 314 Ill. App. 3d at 400.

■ Based upon a review of the record, we do not find that the trial court abused its discretion in finding that defendant failed to meet his burden of demonstrating that the State engaged in purposeful discrimination. Upon remand, in conducting the third step of *Batson*, the trial court heard the State's reason and then entertained argument from both the State and defendant. Defendant's attorney argued that the Defender newspaper was like any other mainstream newspaper, including the Sun Times and Tribune, and defendant's attorney was adamant that the State's basis, that the Defender contained articles about police brutality, was a pretext for discrimination. However, based on the trial court's experience with the prosecutor, which is a proper factor to consider (*People v. Hudson*, 195 Ill. 2d 117, 137, 745 N.E.2d 1246 (2001); *People v. Coulter*, 321 Ill. App. 3d 644, 657, 748 N.E.2d 240 (2001); *Nunn*, 273 Ill. App. 3d at 526), its review of the nature and facts of the case, in particular, the fact that defendant claimed his confession was coerced, its familiarity with the Defender, which, too, is a proper factor to consider (*People v. Primm*, 319 Ill. App. 3d 411, 421, 745 N.E.2d 13 (2000) (stating that the trial court may draw upon its experiences in evaluating whether a given reason is discriminatory or not)), the trial court concluded that defendant failed to meet his burden of proving discrimination. The trial court also found it significant that two blacks ultimately sat on defendant's jury. While defendant argues that this factor is irrelevant, we disagree. As has been stated, the trial court is to consider all of the circumstances of a defendant's trial (*Crockett*, 314 Ill. App. 3d at 397), including the race of the trial witnesses (*People v. Evans*, 186 Ill. 2d 83, 92, 708 N.E.2d 1158 (1999)), and the race of the sitting jurors (*People v. Brown*, 172 Ill. 2d 1, 35, 665 N.E.2d 1290 (1996)). We cannot say that the trial court here failed to conduct a sincere and reasoned effort to evaluate the State's proffered reason for excusing Lee. Clearly, the trial court assessed the genuineness of the State's reason and we do not find that the trial court's decision was clearly erroneous.

## II. Right to Present a Defense

### A. Restriction of Cross-Examination

Defendant next contends that the trial court denied him his sixth amendment right to present a defense because it restricted cross-examination of the State's key witness, Nurse Lee. Specifically, defendant argues that the trial court did not permit him to ask Lee if she knew for certain whether or not the other individuals she previously had seen in the emergency room were being truthful and were, in fact, victims of sexual assault. According to defendant, this information would have explained, qualified, and discredited the damaging

testimony that Lee gave that, out of the 50 sexual assault victims she had seen, only a very few had sustained injuries, since it would demonstrate that Lee did not know for certain if the patients were victims of sexual assault as opposed to having engaged in consensual sex. Defendant also argues that cross-examination of Lee would have shown that Lee's conclusions were based on assumptions, not actual knowledge.

The State contends that defendant has waived this issue because he failed to include it in his posttrial motion. The State also maintains that plain error is not applicable since the evidence was not closely balanced. Substantively, however, the State argues that the record shows that defendant was able to establish that Lee did not specifically know whether the patients were definitively the subject of forcible penetration because Lee testified that she did not know what had happened to them prior to their arrival at the hospital. Thus, according to the State, the questions defendant sought to ask Lee were repetitive and irrelevant. The State also argues that the jury was made aware of sufficient facts with respect to the nature of injuries suffered by sexual assault victims. Lastly, the State maintains that even if the trial court abused its discretion in limiting defendant's cross-examination of Lee, the error was harmless because Lee was not the sole witness to testify with respect to M.L.'s examination and the fact that she suffered no trauma or injury.

At trial, defendant sought to ask Lee the following questions, and the following State objections were sustained:

"Q. [Mr. Campanelli, defendant's attorney:] Isn't it correct you don't know whether the [c]omplainant is truthful or not when you first speak to them [patients]?

A. [Nurse Lee:] I don't know what happened prior to their admission to the emergency room.

Q. [Defendant's Attorney:] That's correct. So when they tell you this, that they're the victim of a sexual assault, you don't know whether they're telling you the truth or not, right.

MR. FALAGARIO [Assistant State's Attorney]: Objection.

THE COURT: Sustained.

Q. [Defendant's Attorney:] Well of those 50 cases that you followed, did you go to Court with each and every one of those cases?

A. No.

MR. FALAGARIO: Objection.

THE COURT: Sustained.

Q. [Defendant's Attorney:] So you don't know whether or not it actually happened based on what they told you, do you?

MR. FALAGARIO: Objection.

THE COURT: Sustained.

\* \* \*

Q. [Defendant's Attorney:] Of those 50 cases that you've seen, how many of them was a forcible penetration?

A. I don't know exactly.

Q. And of the 5 or 6 that showed evidence, you're sure that the sexual assault occurred, isn't that correct?

MR. FALAGARIO: Objection.

THE COURT: Sustained."

■ It is well settled that " ' "the Confrontation Clause guarantees [a defendant] an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' (Emphasis in original.) [Citation.]" *People v. Kirchner*, 194 Ill. 2d 502, 536, 743 N.E.2d 94 (2000). The scope of cross-examination lies within the discretion of the trial court, and we will not overturn its decision absent a clear abuse of that discretion. *Kirchner*, 194 Ill. 2d at 536. The trial court's discretionary authority to restrict cross-examination comes into play after the court has allowed sufficient cross-examination to satisfy the confrontation clause. *People v. Averhart*, 311 Ill. App. 3d 492, 497, 724 N.E.2d 154 (1999). The test of whether the trial court abused its discretion in limiting cross-examination is whether the limitation created a substantial danger of prejudice to the defendant by denying the defendant the right to test the truth of the testimony he sought to challenge. *Averhart*, 311 Ill. App. 3d at 497. The court looks to what the defendant had been allowed to do, not to what the defendant was prohibited from doing, to evaluate the constitutional sufficiency of cross-examination. *People v. Truly*, 318 Ill. App. 3d 217, 233, 741 N.E.2d 1115 (2000). In other words, "[i]n order for a defendant to prevail on a claim that he was denied a sufficient opportunity to confront witnesses at his trial through cross-examination, the defendant must demonstrate the trial court's limitation constituted an abuse of discretion resulting in manifest prejudice." *People v. Nutall*, 312 Ill. App. 3d 620, 627-28, 728 N.E.2d 597 (2000). The trial court properly exercises its discretion to preclude repetitive or unduly harassing testimony, or evidence that is not relevant or only marginally relevant. *Averhart*, 311 Ill. App. 3d at 500. A defendant waives review of the issue as to whether the trial court erred by improperly limiting cross-examination by failing to raise it in his posttrial motion. *People v. Conley*, 306 Ill. App. 3d 1, 8, 713 N.E.2d 131 (1999), citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

■ We briefly note that defendant cites no substantive cases in support of his argument; he cites only cases that stand for general propositions of law. In any event, we find that defendant has waived

this issue by failing to raise it in his posttrial motion. Additionally, any alleged error does not amount to plain error because the evidence against defendant was not closely balanced. *People v. Herrero*, 324 Ill. App. 3d 876, 886, 756 N.E.2d 234 (2001). The record contains M.L.'s testimony, M.L.'s friend testified regarding M.L.'s appearance and demeanor upon her arrival at home after the incident, and Lee and Dr. Betzelos testified that M.L. appeared depressed. Lastly, defendant admittedly stated, at least in part, that M.L. did not consent to defendant's sexual endeavors. Clearly, this was sufficient evidence from which a jury could find defendant guilty beyond a reasonable doubt.

Assuming, *arguendo*, that defendant did not waive this issue, we nonetheless find that defendant's argument is without merit. Defendant's defense was based on M.L.'s consent. Defendant attempted to show, through the restricted cross-examination, that Lee did not have actual knowledge whether the patients she saw, either those without injuries or those with injuries, were, in fact, subjects of sexual assault as opposed to participants in consensual sex. Contrary to defendant's argument, he was able to establish the fact that Lee did not know for certain what had happened to the patients prior to their arrival at the hospital. When asked on cross-examination whether she knew if the complaints were truthful or not, Lee stated that she did not know what happened prior to the patients' admission. Lee further testified that she did not know how many of the patients she had seen were subjects of forcible penetration. Clearly, defendant was able to show that Lee did not actually know whether the patients were victims of sexual assault—precisely what defendant sought to show through the restricted cross-examination. From the above testimony, the jury could infer that Lee's opinion was not based on actual knowledge of whether the patients were sexual assault victims. Thus, the questions defendant sought to ask were repetitive. We therefore find that defendant was not denied his right to test the truthfulness or basis for Lee's testimony and we conclude that the trial court's restriction of defendant's cross-examination of Lee did not result in manifest prejudice to defendant. Accordingly, we hold that the trial court did not abuse its discretion in limiting defendant's cross-examination of Lee.

## B. Jury Verdict Form

■ Defendant next contends that the trial court denied him his right to present a defense by giving the jury a verdict form that contained the term "victim" rather than "complaining witness," thus undermining his consent defense. According to defendant, because the

term "victim" indicated that the conduct was not consensual, the court sent a message to the jury that it did not believe defendant's defense. Defendant admits that he did not object to the form at the time of trial, nor did he raise this issue in his posttrial motion, but he asks this court to consider this error under the plain error doctrine since, according to defendant, the evidence in this case was closely balanced.

The State contends that defendant has waived this issue in failing to object at trial and in not raising it in his posttrial motion. The State further argues that the plain error doctrine does not apply since the evidence of defendant's guilt was overwhelming. Substantively, the State maintains that the sexual assault charge instructions also contained the term "victim," but defendant did not, and does not on appeal, object to these.

We find that defendant has waived this issue based on his failure to object at trial and to raise the issue in his posttrial motion. *People v. Williams*, 181 Ill. 2d 297, 317, 692 N.E.2d 1109 (1998). Additionally, the record does not contain any alternative verdict form tendered by defendant, thus constituting waiver as well. *People v. Reynolds*, 294 Ill. App. 3d 58, 69, 689 N.E.2d 335 (1997). Lastly, the plain error doctrine is not applicable here because the evidence was not closely balanced.

Assuming, *arguendo*, that this issue was not waived, we reject defendant's argument. In evaluating the propriety of jury instructions, including verdict forms, courts look to the totality of the instructions given, not any single instruction. *People v. Tracy*, 291 Ill. App. 3d 145, 154, 683 N.E.2d 182 (1997). In the instant case, the trial court gave the jury aggravated criminal sexual assault instructions, to which defendant did not object. These instructions all contained the term "victim." The jury was also given a "Defense of Consent" and a "Definition of Consent" instruction. The "Definition of Consent" instruction also contained the term "victim." However, defendant did not object.

Based on a totality of the instructions given, we find that defendant was not denied his right to present a defense. The verdict form, which contained the term "victim," tracked the language of the pattern jury instructions given. Additionally, the jury had before it defendant's statement that M.L.'s conduct, to a point, was consensual, the testimony of two medical providers that M.L. had no injuries, and jury instructions on consent. Thus, the jury clearly had the issue of consent before it.

### III. *Apprendi* Violation

■ In a supplemental brief, defendant contends that his consecu-

tive sentences pursuant to section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1998)) violate *Apprendi* because they were based on the element of "single course of conduct with no substantial change," an element which he was not charged with, that was not submitted to the jury, and a charge that was not proven beyond a reasonable doubt. In *People v. Carney*, 196 Ill. 2d 518, 536, 752 N.E.2d 1137 (2001), the Illinois Supreme Court held that section 5—8—4(a) does not violate *Apprendi* and that *Apprendi* is not applicable to such sentences. Accordingly, we reject defendant's argument.

## CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CERDA and WOLFSON, JJ., concur.