THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT TENNY, Defendant-Appellant.

First District (6th Division)   No. 1—89—2210

Opinion filed December 20, 1991.

54

Frederic R. Kein, Clark M. Stalker, and Joseph J. Krasovec III, all of Schiff, Hardin & Waite, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jeanette Sublett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Robert Tenny, was convicted by a jury of the murders of Ezekiel Rhoten and Sabrina Sommerville, but the jury found that the evidence was insufficient to support the imposition of the death penalty. The judge sentenced the defendant to natural life imprisonment without parole. The defendant contends that he was not proved guilty beyond a reasonable doubt. Alternatively, he asks that a new trial be granted because of improper conduct on the part of the State's Attorney; the failure of the State to comply with discovery rules; improper restriction of cross-examination of the State's witnesses; and the improper admission of evidence. He also contends that, if his conviction is affirmed, his sentence should be reduced.

On November 18, 1978, the bodies of Ezekiel Rhoten and Sabrina Sommerville were found in Rhoten's home at 12135 South Normal Street in Chicago. Fingerprints were taken at the scene by the Chicago Police Crime Detection Laboratory. In April 1987, fingerprints lifted from a glass jar found in Rhoten's house during the original investigation were analyzed using a new computer technology known as the Automated Fingerprint Identification System. One of the fingerprints matched those of Ella Haymon. Later comparisons established that four of her fingerprints had been found inside the house. The fingerprints of Dolores Lamb were also identified. After Haymon was arrested, she told the police that she had participated in the robbery and killing of Rhoten along with Lamb, Theaster Hunter, Johnny Armstrong and the defendant. Lamb, Hunter and the defendant were taken into custody. The police learned that Armstrong had died. The defendant was indicted with Lamb and Haymon; Hunter was indicted

separately. Lamb and Haymon testified against the defendant while the charges of murder were still pending against them. No fingerprints of the defendant, Armstrong or Hunter were discovered in Rhoten's house.

The judge denied the defendant's pretrial motion to suppress his court-reported statement. The State, however, did not introduce that statement into evidence. Consequently, the State's entire evidence implicating the defendant is the testimony of two accomplices, corroborated only by each other, more than eight years after the killing. We make this observation at the outset to answer the State's argument that any error assigned here would be harmless since, the State maintains, the evidence is overwhelming. In our judgment, the testimony of two accomplices under all the circumstances present in this case is not overwhelming. We will first address the defendant's contention that he was not proved guilty beyond a reasonable doubt.

Dolores Lamb testified that on November 18, 1978, she and Ella Haymon arrived at a Chicago pool hall located at 57th and Ashland; their acquaintance, Theaster Hunter, arrived later. Lamb had dated Hunter's brother for two years and lived in Hunter's house during that time. Hunter approached Lamb and asked to speak with her privately. Meanwhile, Haymon talked to the defendant and Johnny Armstrong while sitting in the defendant's car outside the pool hall. After Lamb and Hunter finished their conversation, they went to the defendant's car. Apparently, while Lamb and Hunter were away from the others, Hunter had shown Lamb a gun. Once in the car, Haymon asked the defendant if he would drive her to Ezekiel Rhoten's house. The defendant agreed, and he, Hunter, Lamb, Haymon and Armstrong drove to Rhoten's home at 12135 South Normal. On the way, Hunter asked Haymon whether Rhoten had any money because he wanted to steal it. The defendant said that he "wanted to stick [Rhoten] up."

When they arrived at Rhoten's house, Hunter instructed Lamb and Haymon to go into the house and to leave the door unlocked behind them so that the others could come in quickly and surprise Rhoten. Lamb and Haymon left the car and went to the house next door. They knocked on the door and were told by a man, Joseph Henderson, that they had the wrong house. Lamb and Haymon then went back to the car, and Lamb told Hunter that Haymon had reservations about going into Rhoten's house. Hunter became angry and told Haymon she had better do as she was told. Haymon and Lamb then walked up to Rhoten's house and rang the doorbell. Rhoten appeared in an upstairs window, saw Haymon and came downstairs to let her

and Lamb in. Shortly after they were in the house, Sabrina Sommerville, a guest in the house, joined the others downstairs in the living room. Lamb testified that she and Haymon took a seat on the couch. Haymon and Rhoten were having a conversation when Hunter burst into the house, followed by Armstrong and the defendant. Both Hunter and Armstrong were carrying guns. Hunter yelled that it was a stickup; he was going to rob Rhoten. Rhoten laughed and told Hunter to get out of his house. Hunter began beating Rhoten's head with his pistol. Rhoten then bent down and reached under a chair for a gun. After a struggle, Hunter took Rhoten's gun and gave it to the defendant, who pointed the gun at Rhoten. After Hunter struck Rhoten with his pistol, he struck Sabrina Sommerville over the head with "a vase or a statue or something," knocking her unconscious. Sommerville fell backwards onto the couch.

Hunter then pushed Rhoten and ordered him upstairs. Everyone except the defendant followed Hunter and Rhoten upstairs. Rhoten attempted to run while he was going up the stairs, but Lamb caught him, and then Hunter grabbed him. They forced Rhoten into his bedroom. Lamb and Haymon tied Rhoten with a rope and beat him with a belt. Hunter ordered Rhoten to give him his money or he would die. Rhoten kept telling Hunter he did not have any money. Hunter then began to stab Rhoten repeatedly. Finally, Hunter raised a pillow to Rhoten's face, pulled out his gun and fired a single shot into Rhoten's head.

Upon Hunter's orders, Armstrong, Haymon and Lamb searched through the house looking for valuables. Downstairs, Lamb saw the defendant coming out of the kitchen and Sommerville lying unconscious on the couch. Hunter again hit Sommerville on the head, this time with his pistol. Lamb never saw the defendant strike Sommerville. They returned to the car with a stereo and some of Rhoten's clothes, a television and other personal belongings. They loaded the items into the defendant's car and went to Hunter's house. Upon arriving at Hunter's house, he, Armstrong and the defendant unloaded the items and put them in the basement. Haymon left Hunter's home first after four or five hours; then the defendant and the others left, while Lamb stayed overnight.

Ella Haymon testified that she offered to pay the defendant to give her a ride to Rhoten's house, and he agreed. She had dated Rhoten for four years and had moved out of his house only three days before. Haymon had the understanding that only she, the defendant and Lamb would go to Rhoten's house. However, the defendant, Haymon and Lamb were joined by Armstrong and Hunter. During the ride, in

response to a question by Hunter, she told him that Rhoten worked. She could not hear anything else due to loud music playing on the car radio.

When they arrived at the house Lamb told Haymon that Hunter had a pistol and that he wanted them to get into Rhoten's house and leave the door unlocked. Haymon led Lamb to Rhoten's next-door neighbor's house, knowing it was the wrong house. Hunter did not know that it was the wrong house because he had never been there before. She told Joseph Henderson that she and Lamb were in trouble and asked him to help. Henderson said he did not want to get involved, and Lamb and Haymon returned to the car. Lamb told Hunter that Haymon did not want to go through with the plan. Hunter threatened Haymon that if she did not help, he would kill her. Haymon and Lamb rang the doorbell, and Rhoten answered.

Haymon testified that she asked Rhoten for money. Hunter, Armstrong and the defendant came through the front door; Hunter and Armstrong had guns drawn, and Hunter told Rhoten it was a stickup. Hunter struck Rhoten in the head with his pistol. Rhoten fell to the floor and reached under his couch for a gun. Hunter wrested the gun from Rhoten and gave it to the defendant. The defendant pointed the gun at Rhoten. When Sommerville jumped from the couch, she was struck with a lamp by Armstrong. (Lamb had testified that Hunter, not Armstrong, first struck Sommerville with "a vase or statue or something.")

When Haymon was upstairs Hunter ordered her and the others to search Rhoten's room for valuables. Lamb and Haymon went through dresser drawers and a closet. Hunter told Armstrong to watch Rhoten, and Hunter and Lamb went downstairs. Armstrong then told Haymon to keep an eye on Rhoten while Armstrong "rumbled" through the closet. She beat Rhoten with a belt at the direction of Hunter. Haymon testified that she mouthed the word, "Run," to Rhoten, and Rhoten jumped up and ran down the stairs, but Lamb caught him. Rhoten was then taken back upstairs where he was beaten, stabbed and shot. After Rhoten was killed, Haymon took her clothes and television, and the four went downstairs to join the defendant. Hunter then hit Sommerville two more times over the head with a hammer while she remained motionless on the couch. The defendant took Rhoten's gun out of the house.

Haymon testified that on their way to Hunter's house, Hunter threw the knife and hammer he had used out the window. She and Lamb left Hunter's house about one half hour after arriving.

Doris Rhoten-Barnes, Rhoten's estranged wife, testified that Rhoten usually kept a gun in the night stand in his bedroom. After receiving news that Rhoten had been killed, she went to his home. She found certain items to be missing including suits, a television, a .25 caliber handgun, all of Rhoten's knives, some old coins and a diamond ring.

Joseph Henderson testified that he remembered answering his door around one o'clock in the morning of November 19, 1978, to two women he had never seen before. He did not remember anything else; he did not even know whether the two women went to Rhoten's house after leaving.

Dr. Robert J. Stein, the Cook County medical examiner, testified that Rhoten died of a gunshot wound to the jaw, and that Sommerville's death was due to a severe cranio-cerebral injury which included multiple skull fractures caused by six blows with a blunt instrument. Portions of her brain were sticking out of the fractures.

Detective Joan Ryan testified that Rhoten's body was lying on a box spring mattress in the upstairs bedroom. The bedroom, as well as the rest of the house, appeared to have been ransacked. Rhoten had been stabbed in the neck, chest and back, and his hands and feet were bound with a rope. His body was covered with a blanket that had holes in it corresponding with his stab wounds. Sommerville's body was lying on a "love seat" which was stained and spattered with blood. The side of her head "was bashed in." Fragments of plaster were found in her robe. A plaster piece of statuary was recovered from the room where her body was lying.

■ While we have said the evidence was not overwhelming, we judge that the evidence was sufficient to establish guilt beyond a reasonable doubt. The testimony of the two accomplices was corroborated to some degree by the testimony of Henderson that two women came to his door on the morning of the killing and by the recovery of their fingerprints from the scene. That corroboration obviously does not extend to their implication of the defendant, but, on the other hand, no suggestion had been made of a motive that would cause them to implicate the defendant falsely. Their testimony may have differed in small details, but, considering the lapse of almost 11 years between the occurrence and their testimony, the differences in their recollection of events are understandable.

The jury was apprised of all the infirmities in their testimony. Haymon was a daily drug user at the time of the killings up until the time she was arrested. She engaged in prostitution to support her drug habit. She was impeached by showing that she admittedly lied

when she first told the police she knew nothing about the killings. Lamb also was a drug user and engaged in prostitution. She admitted that she told some lies to the police when they first questioned her, but she did not know what lies she had told them. She had previously been convicted of a felony, aggravated battery.

The defendant's principal argument was that he was merely present and, therefore, could not be held accountable for the actions of Hunter, Armstrong, Lamb or Haymon. The evidence most damaging to his defense was the testimony of Lamb and Haymon that he held a gun on Rhoten. The jury was informed that neither Lamb nor Haymon had ever told the police or the grand jury about the defendant's possession or use of Rhoten's gun. They first told the State's Attorney shortly before the trial. The jury was also instructed that the testimony of Lamb and Haymon should be regarded with suspicion.

Thus, the jury was fully cognizant of the weaknesses in the testimony of Haymon and Lamb and was properly instructed. Nevertheless, the jury chose to believe their testimony, which was not inherently improbable. After reviewing the record, we cannot substitute our judgment for that of the jury. (See *People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) For these reasons, we reject the defendant's claim that he was not proved guilty beyond a reasonable doubt.

■ The defendant next maintains that reversible error occurred when the judge refused to grant a mistrial after the State rested without introducing the defendant's court reported statement and again during the State's final argument. An understanding of this argument requires a consideration of the State's opening statement as well as the fact that the State vigorously resisted the defendant's motion to suppress his statement.

In the opening statement the prosecutor told the jury that both Haymon and Lamb had implicated the defendant, Hunter and Armstrong and would testify and plead guilty later. He also said the following:

> "Having talked to [Haymon and Lamb] *** Chicago police investigators from Area 2 Violent Crimes located Robert Tenny, interviewed him at the police station and Robert Tenny admitted his part, or at least part of his part, his role in the robberies, home invasion and murder of Ezekiel Rhoten and Sabrina Sommerville."

We pause to express our view that a lay fact finder, unaware of the fine distinction between an admission and a confession, could well in-

fer from that statement by the prosecutor that the defendant had confessed that he had committed a robbery, home invasion and murder.

The defendant's attorney began his opening statement by telling the jury that the defendant did not hit Sabrina Sommerville, did not tie up or beat or shoot Ezekiel Rhoten; that he did not plan or participate in the planning of their deaths; and that he did not assist anyone else in bringing about the deaths of Rhoten and Sommerville. He said that the defendant had agreed to take Haymon to Rhoten's home; that he assumed that Haymon and Lamb wanted to go to Rhoten's home to "turn tricks for prostitution." He also told the jury that all the time that Lamb, Hunter, Haymon and Armstrong were in the house committing the crimes against Sommerville and Rhoten, the defendant was sitting in the car in front of Rhoten's house. After becoming concerned why the others were in the house for such a long period of time, he walked into the house and saw Sabrina Sommerville on the couch slumped over. When he went upstairs he saw Rhoten dead in the bed.

The defendant's attorney also told the jury that the defendant had waived his right to remain silent and cooperated and answered questions asked of him by the police. He pointed out that Ella Haymon and Lamb had changed their stories, but that the defendant's statement was consistent with the first statement of Ella Haymon. Both the defendant and Haymon had told the police that they had no idea that there was a robbery planned. However, he said, the stories of Lamb and Haymon changed considerably to help themselves by testifying against the defendant. The attorney concluded by saying that the undisputed evidence would be that the defendant did not plan, and did not participate in a plan, to kill Sommerville and Rhoten. The tenor of his opening statement was that the defendant was not guilty of any crime either as an active participant or on the basis of accountability.

After the State rested without introducing the defendant's statement, the defendant's attorney moved for a mistrial. The prosecutor's response in part was as follows:

> "However, I have elected and I think properly so, during the course of the trial, not to introduce the portions of that statement because of the much self-serving nature of the statement as used at great length by the defense in their opening statements at this trial.

* * *

In opening statements before this Court, we were told that Robert Tenny was the most cooperative man in the world who

couldn't wait to tell the police his story. And that turn of events is what precipitated my choice of not using the defendant's self-serving statement which I believe legally is a—*an admission under accountability theory*. But nonetheless, inconsistent with much of the evidence that we have presented. The decision was not made until the cross examination of each of the other witnesses that the People presented was completed. The defense, I don't believe, has any right to try and force us to introduce evidence or determine the way in which we introduce that evidence.

* * *

My statement was made during an opening statement in good faith. And I stand by it at this point. I did not highlight it in any way. And I did nothing improper. Yesterday at the conclusion of additional evidence, we determined not to proceed with further evidence. That is our decision. We stand by it." (Emphasis added.)

The judge then denied the motion for a mistrial.

Immediately after the judge denied the motion for a mistrial, the State's Attorney made a motion *in limine* in which he asked the court to bar any testimony by the defendant concerning the statements he had made to the police. He characterized those statements as inadmissible hearsay. The judge did not rule on the motion, and the defendant did not testify.

During the final argument the prosecutor said this:

"Well, how do you know that Ella Haymon and Dolores Lamb were telling you the truth here. Well, first of all, a lot has been conceded. It's conceded that Robert Tenny was with Hunter and Armstrong that night. It's been conceded that he drove out of there with the other four people. It's been conceded that he entered the—

[DEFENSE ATTORNEY]: Your Honor, I have an objection to this line of argument in this case. It's the State's burden to prove every single fact. Defense has no burden—

THE COURT: Overruled. Counsel may argue.

[STATE'S ATTORNEY]: It's been conceded that he drove them back."

The State now tells us that its argument that matters were "conceded" was based on the defendant's attorney's opening statement.

It is our judgment that the State's procedures in this case, sanctioned by the judge, constituted prejudicial error which deprived the defendant of a fair trial. We so judge even if the prosecutor acted in

good faith. We have no reason to believe that he did not; we accept his statement that the decisions he made were "tactical" decisions.

As we previously noted, a lay fact finder could conclude from the State's opening statement that the defendant had confessed to the crime. Judging from the prosecutor's remark later that the defendant's statement was "an admission under accountability theory," he was of the opinion that it was a confession. The record does not contain a copy of the statement the defendant made. If it consists of what the defendant's attorney said in his opening statement, it was not a confession.

It is the general rule that a prosecutor cannot comment during his opening statement upon what evidence will be introduced and fail to introduce that evidence. (*People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254.) In view of the State's failure to establish that the defendant had, in fact, confessed, the defendant at the very least was entitled to show that he had not confessed. We do not depart from the general rule that self-serving statements by an accused are inadmissible hearsay. But we do not think the rule may be invoked under the circumstances of this case. The judge should have ruled on the State's motion *in limine*, and he should have denied it. The defendant would have been alerted by a prompt ruling that he could take the stand and testify to what he had told the police. Under the circumstances present here, he could not make a reasoned judgment as to whether he should take the stand because he could not be certain that he would be permitted to testify to the contents of his statement.

To compound the error, the State was then permitted to use the defense attorney's statement as evidence. The inconsistency in the State's position is obvious to us. The prosecutor told the judge in his opposition to the motion for a mistrial that the judge would instruct the jury that opening statements are not evidence. On the other hand, the State now tells us, in effect, that the defense attorney's opening statement was evidence.

The State enjoyed the best of all possible worlds. It could lead the jury to believe erroneously that the defendant had confessed; it could prevent him from showing the jury he had not confessed; it could successfully resist the defendant's attempt to suppress the statement, *which would have been corroboration of the testimony of the accomplices*; and it could treat, as evidence, the defendant's attorney's opening statement, which, it is reasonable to assume, was prompted by the expectation that the State would introduce the statement whose admissibility it had urged the judge to permit.

■ The defendant also contends that error occurred when the prosecutor argued as follows:

> "You now know when Ella Haymon and Dolores Lamb were in that pool hall at 57th and Ashland that night, that they met up with three men who entered that establishment together. They entered it together and that indicated and is evidence of the fact that they were working together that night as a sophisticated, experienced team of killers."

We agree with the defendant's contention that the use of the term "experienced" was designed to convince the jury that the defendant had participated in other killings with Armstrong and Hunter. Therefore, it was improper. (See *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629.) No objection was made to the prosecutor's statement, but we deem it to be plain error in this case. See *People v. Natoli* (1979), 70 Ill. App. 3d 131, 387 N.E.2d 1096; *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217.

■ We also agree with the defendant that the judge erred by unduly restricting the cross-examination of Lamb. It is the general rule that in any case where an accomplice testifies, wide latitude should be given the defendant to determine the motive of the accomplice in testifying. (*People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) The State's Attorney told the jury that Haymon and Lamb would plead guilty to murder. However, both of them testified that they did not intend to plead guilty. The inconsistency between the prosecutor's opening statement that the accomplices would plead guilty and their testimony that they would not plead guilty presented a subject that the defendant's attorney should have been permitted to explore. He was not.

On direct examination of Lamb the following occurred:

> "Q. Through your lawyer have you reached an agreement with the prosecutor, specifically me?
>
> A. No, I haven't.
>
> Q. Through your lawyer have you agreed to do something in relation to Robert Tenny and Marcus Hunter?
>
> A. No."

Lamb testified on cross-examination that she was not going to plead guilty. After that the following occurred:

> "[DEFENSE ATTORNEY]: Are you guilty of anything that you are charged with?
>
> THE COURT: Wait just a moment.
>
> [STATE'S ATTORNEY]: Objection.
>
> THE COURT: Objection sustained.

[DEFENSE ATTORNEY]: Ms. Lamb, you have an understanding through your lawyer about what will happen to those charges?

[STATE'S ATTORNEY]: Judge, objection. Asked and answered.

[DEFENSE ATTORNEY]: No. I'm asking do you.

THE COURT: No. No. No. Wait. You started out with all this, counsel, so don't go back to it now. We have covered all that.

* * *

THE COURT: Let me tell you. There was no objection, but your question about what—whether the witness here intends to plead guilty or not, the question and answer are stricken.

[DEFENSE ATTORNEY]: If I may, Your Honor. [The State's Attorney] opened by saying this witness and the other witness would plead guilty to murder.

THE COURT: Well, your question to her is not [the State's Attorney] on the witness stand. That question and answer is [sic] stricken. Now, what do you want to ask and get to it directly.

[DEFENSE ATTORNEY]: Do you have any understanding—I'm sorry. Do you have any idea, you, not anybody else, of what you hope to gain in relation to your pending murder charges—

[STATE'S ATTORNEY]: Objection.

[DEFENSE ATTORNEY]: (Continuing)—by testifying in this case?

THE COURT: Objection sustained to the form of the question, what she hopes to gain.

* * *

[DEFENSE ATTORNEY]: Ms. Lamb, have you spoken to your attorney about whether or not you should testify in this matter?

[STATE'S ATTORNEY]: Objection, Judge.

THE COURT: Sustained. What she has talked to her attorney about is a confidential matter.

[DEFENSE ATTORNEY]: Your Honor, may I have a side bar on this issue because I specifically—

THE COURT: No. You may ask another question.

* * *

THE COURT: I told you. Ask direct questions. It's none of your business what she had talked to her attorney about.

[DEFENSE ATTORNEY]: To the extent that you have spoken with your attorney, Ms. Lamb, do you have a hope in this case of what good its going to do you to testify against Robert Tenny?

[STATE'S ATTORNEY]: Objection.

THE COURT: Objection sustained to the form of the question."

We believe those rulings of the judge constituted error. The question of whether she intended to plead guilty was a proper one. The judge was wrong when he said that what her attorney told her was confidential. If it were the law that information about an agreement with the State given by an attorney to his client may not be disclosed, disclosure of any agreement could always be prevented by the simple device of the prosecutor using a lawyer as the conduit for the information rather than the prosecutor giving the information directly to the witness. The judge was also wrong when he refused to permit Lamb to be asked what she hoped to gain. The expectations of accomplice witnesses are always probative whether they be realistic or fanciful. *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9.

After the State rested, the defendant moved for a mistrial based on the variance between the prosecutor's comment in opening statement that the witnesses would plead guilty and their testimony that they did not intend to plead guilty. The prosecutor responded as follows:

"With regard to the statements in opening statement regarding possible guilty pleas by Dolores Lamb and Ella Haymon, *those were made based on conversations I have had with their attorneys.* They understand that in exchange for their agreement to testify, if they expect any consideration from the State's Attorney, it would be in exchange for guilty pleas to the murder of both of these victims. And they will not have these charges ever dropped against them.

They will, sometime in the future, determine whether or not they choose to plead guilty. And that changes, apparently, from day to day as I have learned from listening to their testimony and talking to them. I expect if they see Robert Tenny gets a not guilty verdict, they are not going to plead guilty to anything. But that's a decision they have made. And I have made that statement in good faith. And there's nothing improper about what I have said." (Emphasis added.)

Again, we have no reason to doubt that the State's Attorney made his comments in opening statement in good faith. It is obvious

to us that he was taken by surprise by the testimony of Lamb and Haymon. We find it impossible to believe that the lawyers for Lamb and Haymon did not apprise them of any agreement they made with the State's Attorney. Consequently, the defendant's attorney should have been given every opportunity to inquire into what the witnesses were told by their attorneys as to any agreement. Indeed, under the circumstances, not only was the defendant entitled to inquire about any agreement reached by the witnesses and lawyers, it was the duty of the State to inform the jury of the agreement and its terms, whatever they might be. If a prosecutor is aware of facts which would affect the credibility of an accomplice, he has an obligation under the constitution to bring those facts to the attention of the jury. See *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.

We conclude that the cumulative effect of the prejudicial argument, the restriction of the cross-examination of Lamb and the procedures followed concerning the defendant's statement deprived the defendant of a fair trial.

■ There are other assignments of error by the defendant which we find to be without merit and which we will discuss briefly. The brief reference to the deceased's widow in final argument was improper but not prejudicial; the introduction of the defendant's photograph, which was identified by Haymon, was not error; the prosecutor's statement that the charges against Haymon and Lamb would not be dropped was invited by the defense attorney's argument; and the prosecutor's explanation to the jury of the law of accountability was correct.

Since this cause is being remanded, we need not decide the defendant's claim that the State violated the discovery rules by belatedly providing him with the information that the witnesses would testify that the defendant had a gun and that the body of Sommerville had been moved while only the defendant was present.

For these reasons, the judgment of the circuit court is reversed and the cause remanded for a new trial.

Reversed and remanded.

McNAMARA and LaPORTA, JJ., concur.