# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. James*, 2013 IL App (1st) 112110

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY JAMES, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2110 |
| Filed | September 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for first degree murder, the appellate court rejected his contention that the trial court abused its discretion in limiting his counsel's cross-examination of his codefendant about the sentence he would have received under his plea deal and whether he rejected the deal because he was not going to testify about his handwritten statement, since codefendant was not an accomplice testifying in return for lenient treatment, defendant's confrontation rights were satisfied by the information about the accomplice's failed plea deal that was disclosed, defendant presented no authority holding that a witness's testimony may be bolstered by his refusal to plead guilty in exchange for a plea agreement, and even if the restriction of cross-examination was error, it was harmless, because the verdict was not affected. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-28580; the Hon. Thomas M. Tucker, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jeffrey W. Allen, Christine Cook, and Ranjit S. Hatti, Assistant State's Attorneys, of counsel), for the People. |
|---|---|
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion. Justices McBride and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a jury trial, defendant Gregory James was found guilty of first degree murder. The trial court sentenced him to 33 years' imprisonment. Defendant appeals, arguing that the trial court abused its discretion in limiting defense counsel's cross-examination of the codefendant, Lee Stapleton.[1] We affirm.

¶ 2     The State asserted at defendant's 2011 jury trial that, on the night of October 21, 2003, defendant and Stapleton went to collect a drug debt from Cynthia Hayden at the house of the victim, Edward Mikutis, in Berwyn, Illinois. Finding only the victim at home, they murdered him and took his property. On the other hand, the defense asserted that Hayden was indebted to many drug dealers and had been stealing collectable coins from the victim, and that Stapleton was solely responsible for killing the victim.

¶ 3     The trial evidence indicated that the victim worked at a newsstand and lived on South Ridgeland Avenue in Berwyn, Illinois. He collected coins and sports trading cards as a hobby. In 2003, the victim began dating Hayden, who was unemployed and receiving social security disability. Hayden admitted that she was using crack cocaine several times per week in 2003. Her nickname for the victim was "the Boss." She knew that he collected coins and trading cards, but she denied taking these from the victim to pay for drugs. She testified that the victim "bought the majority of the drugs," but she denied using him to support her drug habit.

¶ 4     She also knew defendant, or "Larry," because he supplied rock cocaine, and she saw him two or three times per week. Through defendant, she knew someone named "Capone"; she

---

[1]Defendant and Stapleton were initially indicted for 15 counts of first degree murder, 2 counts of home invasion, 1 count of armed robbery, and 3 counts of residential burglary. On May 12, 2009, Stapleton pled guilty to first degree murder, home invasion, and armed robbery, and received concurrent sentences of 20 years' imprisonment.

would see them together and they had been to the victim's house on prior occasions.

¶ 5        Hayden testified that on October 21, 2003, she owed defendant $125 for an "eight ball" of rock cocaine; she told defendant that she would pay him at 6 p.m. She indicated that she was at the apartment of her friend and fellow cocaine user, Mariam Jovanovic. Around that time, Hayden saw defendant in the alley near the apartment. Defendant told her, "Time's up." Hayden responded that she still had 15 minutes and walked away.

¶ 6        Hayden went to the newsstand where the victim was working and spoke with him. Hayden testified that the victim was smoking rock cocaine at the newsstand and at some point he dropped some drugs and was searching for them on the ground; she believed that he was addicted to cocaine. She thought she saw a large knife or a sword behind the magazines; it was the first time she had seen it. She later returned to Jovanovic's apartment.

¶ 7        Hayden testified that at approximately 9 p.m., she spoke with defendant on the telephone and informed him that she did not have the money. He responded that "he was going to get–that I and my boss, we will pay for it." Defendant sounded "[v]ery angry, scary." Hayden stayed the night at Jovanovic's apartment, which she had never done before. Hayden claimed that she attempted to sell her son's baseball card that evening; she denied taking the card from the victim.

¶ 8        Early the next morning, Hayden went to the victim's house and used her key to enter through the back door. She found the victim unresponsive on the living room floor with duct tape around his face. She attempted to cut the tape around his wrists and called 911. Hayden testified that when the police arrived, she was trying to cut the tape from the victim's mouth so he could breathe, but the police told her to put the knife down and go to the porch. The police subsequently took her to the police station; she testified that she went willingly.

¶ 9        Berwyn police officer Mark Schwanderlik responded to the victim's address at about 6 a.m. on October 22, 2003. He found the victim lying on his back in the living room, apparently deceased, with duct tape covering his face and wrapped around his head. The duct tape went from just above his chin to above his eyebrows, and his arms and feet were also bound with duct tape. In a laundry basket near the victim, there was a partially used roll of duct tape. The pockets of the victim's pants were turned inside out and appeared to be empty. The paramedics arrived shortly thereafter and confirmed that the victim was deceased and rigor mortis had set in.

¶ 10       Schwanderlik indicated that there were no signs of forced entry to the home, but it appeared as if there had been a struggle. The living room was in disarray, the couch cushions were placed in the bathtub, furniture was overturned, and items were strewn about. In the master bedroom, drawers were removed from the dresser and dumped upside down on the bed, and items were pulled out of the closet and thrown to the floor. A cabinet in the living or dining room had been opened and boxes and drawers had also been emptied onto the floor.

¶ 11       According to Hayden, at the police station, the police asked her to make a list of people who were upset with her or the victim. Hayden provided them with the name "Larry." She testified that she made a list of 5 to 10 names for the police, including her brother and an individual named Mike Keenan. She denied providing the name "Capone." At trial, Hayden testified that she was aware of other individuals in Berwyn who sold drugs besides

defendant, but she owed money only to defendant, and she never bought drugs from Stapleton. Hayden denied telling the defense attorney before trial that she owed money to various people besides defendant. She denied that her brother, Keenan, or an individual called "Long-Haired Johnny" were drug dealers, or that she had told the defense attorney this prior to trial. Hayden also denied that she would lie, cheat, or steal to keep using crack cocaine. She admitted to pleading guilty to possession of a controlled substance in 2004, and kidnapping in 2007.

¶ 12    An autopsy of the victim indicated that he died from suffocation due to his face and mouth being bound tightly with duct tape, and two stab wounds to the victim's right abdominal side were significant contributing factors to his death. The duct tape covered both nostrils, mouth, left eye and ear, and partially covered his right eye and ear. Attached to the duct tape at the back of the victim's neck was a purple blouse, which was not part of the victim's clothing. The victim had hemorrhages in his eyes, lips, the muscles of his neck, and in his brain; a fractured Adam's apple; and a laceration on the right side of his forehead. The victim's blood tested negative for alcohol, opiates, cocaine, and metabolites of cocaine.

¶ 13    The same day the victim's body was discovered, October 22, 2003, Berwyn police sergeant Gerald Conoboy went to the apartment complex located on Grove Avenue, about one mile from the victim's house, to speak with Jovanovic, the apartment complex manager who also lived in the complex. Conoboy was looking for someone named "Larro" or "Larry." While speaking with Jovanovic, defendant knocked on the back door. Defendant was taken into custody based on an unrelated pending drug investigation and the murder investigation.

¶ 14    The police also obtained and executed a search warrant for defendant's apartment that same day. The police recovered several pairs of shoes and some coin collections. There were two black sweatshirts floating in liquid in the bathtub. According to Berwyn police sergeant Michael Ochsner, he observed a ceremonial sword in the apartment, but he did not collect it because he did not think it was relevant to the case. At the time, he believed that the victim had suffered a gunshot wound. It was not until after the autopsy, which occurred after the search warrant was executed, that the police learned the victim had stab wounds. Ochsner indicated that a sword appeared in a photograph of the living room that was taken by police that day.

¶ 15    The Bellwood police department assisted Berwyn police in locating an individual nicknamed "Capone" and whose first name was Lee. Bellwood police found Stapleton on November 30, 2003, and he was transferred to the Berwyn police department.

¶ 16    On the same day, Assistant State's Attorney Maureen O'Brien and a detective interviewed Stapleton at the Berwyn police station. Stapleton agreed to speak with O'Brien and signed and initialed the notice of rights form. O'Brien testified that after Stapleton gave her some information, she asked whether he wanted to memorialize his statement, and Stapleton indicated that he did not want to be videotaped but he wanted her to write out his statement. She testified that after she finished writing the statement, she read each page to him and asked if he had any corrections; he made some corrections and then signed the bottom of each page and at the end of the statement. The statement indicated that Stapleton was giving the statement voluntarily and because it was the truth, and had read it and was

allowed to make corrections. O'Brien testified that the police photographed Stapleton and they signed the photograph.

¶ 17    O'Brien read the November 30 statement aloud to the jury.[2] The statement related that Stapleton knew defendant was a drug dealer and had gone with him to collect drug debts, he knew the victim from the newsstand and saw defendant deliver cocaine to him one time, and that he heard the victim was living "with a hype who was a drug customer" of defendant.

¶ 18    The statement gave an account of what occurred on October 21, 2003. Stapleton recounted that he was with defendant at defendant's apartment at 1927 Grove in Berwyn at 5:30 p.m., when defendant received a call from a "female hype" about money she owed defendant, and defendant was going to pick up the money "at the old man's house." At about 9:50 p.m., defendant used Stapleton's telephone to call "the female hype," and she told defendant that she had spent the money. In response, defendant "was out of control and mad" and he threatened, "if I don't get my money, I'm going to fuck you up." Defendant told Stapleton that he was going to get his money, and when Stapleton asked if he was "okay, like calmed down, and he said no, walk with him." The statement indicated that defendant was "very mad and upset about not getting paid" for the drug debt, and they walked to the victim's house. Defendant knocked on the door and the victim answered. According to the statement, defendant asked the victim for "the hype," but she was not home, and the victim said they could wait for her inside.

¶ 19    Stapleton indicated that he sat in a chair in the front room while defendant went to the bathroom. The victim offered to pay defendant the next day because he did not have the money; Stapleton "thought it was a reasonable request" and "kind of worked out the arrangement for the old man to pay for the hype the next day when [defendant] came out of the bathroom." According to the statement, defendant "grabbed the old man with [his] right arm around the old man's neck. [Defendant] held the old man in a choke hold and produced a knife in his left hand. It was a pocketknife with a kind of wooden handle." Defendant threatened, "if you don't give me my money, I'm going to fuck you up." The victim responded that he did not have the money, and defendant and the victim "start[ed] tussling."

¶ 20    In the statement, Stapleton recounted that the victim tried to grab the knife, while defendant tried to push the victim over the table. The victim ended up on his back with defendant's "knee in his chest and [defendant] was on top of the old man." Defendant held "the old man's hands with his left hand and then stabbed the old man with his right hand in the side two times." The victim was shaken and stated, "oh, my God." Defendant told him to sit on the couch, and then to lie down. Defendant sat on the victim's stomach and grabbed some duct tape from a drawer while holding the knife in his hand, telling him, "if you move, I'm going to kill you." Defendant then taped the victim's legs at the ankle, told him to hold his arms up, and again threatened to kill him if he did not comply. The victim complied, and

_____

[2]We note that, at trial, Stapleton testified before O'Brien and denied the substance of the written statements recounted above. O'Brien's testimony regarding his written statements was therefore presumably admitted as substantive evidence following his denial pursuant to section 115-10.1 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2008)).

defendant then taped his wrists.

¶ 21    In the statement, Stapleton indicated that he told defendant, "what the fuck are you doing, we just came here to collect money. You didn't tell me you were going to do this shit." Defendant responded, "don't bail out on me or I'm going to shank you." According to the statement, defendant then taped the victim's mouth.

¶ 22    Stapleton then related that he searched the house to make sure no one else was there. When he returned to the living room, defendant "had taped the old man's entire head and face." The victim struggled and tried to roll off the couch, but defendant held him down and then laid on top of him. Stapleton's statement indicated that defendant then "grabbed the old man's head and squeezed it into [defendant's] chest to suffocate him. [Defendant] kept the old man's head into his chest for two minutes so the old man couldn't breathe. The old man's body was shaking and kicking" as defendant held his face to his chest. Finally, the victim kicked once more and defendant got off of him. Defendant "grabbed the old man's head into his chest one more time to make sure he was dead." Stapleton "told [defendant] he killed this man and that I was out of here." Stapleton left and returned to defendant's apartment; defendant arrived about 35 minutes later carrying a sword, a bag of coins, and a bag of jewelry. The change totaled about $25.

¶ 23    O'Brien testified that on December 1, 2003, she was at the police department interviewing defendant when an officer informed her that Stapleton wanted to speak with her again. Stapleton again initialed a waiver of rights form. O'Brien testified that Stapleton also wanted her to write out this statement. In the statement, Stapleton indicated that he had not spent the night at his house since the October 21 incident and he was afraid of being arrested. Further, Stapleton related that during the incident, defendant told him to grab the victim so defendant could tape him, and Stapleton held the victim's shoulders while defendant taped the victim's ankles. Stapleton indicated that he then grabbed the victim's ankles because the victim was kicking and he held them while defendant taped the victim's hands. After giving this second statement, O'Brien reviewed it with him, and then Stapleton, O'Brien, and a detective signed it. O'Brien denied making any promises to Stapleton.

¶ 24    O'Brien also took a statement from defendant on December 1, 2003, with a detective present. She testified that she informed defendant of his rights, and he agreed to speak with her and he signed the waiver of rights form. O'Brien indicated that defendant did not want to videotape his statement, but he agreed to have O'Brien write it out. She later reviewed the statement with him, and he made many corrections, signed each page, and signed at the end of the statement. The police took a photograph of defendant, which they signed.

¶ 25    In the written statement, defendant indicated that he was 20 years of age, lived at 1929 B South Grove, Berwyn, Illinois, and sold cocaine. He met Hayden, "a hype, who's a crack head in Berwyn, Illinois," and she bought drugs from him many times. Sometimes she would tell him to pick up the money "from Ed, the guy at the newsstand and then Ed would pay me"; defendant indicated that he knew that the victim was her boyfriend, and the victim called him by his nickname, "Larry" or "Larrow." She sometimes paid defendant in silver bullions or rare coins.

¶ 26    In the statement, defendant related that Hayden called him on October 21, 2003, "all day

trying to get some credit, some drugs for free," and at 8:30 p.m., she told him to bring her seven bags, or one ounce, of cocaine. Defendant told her that this would cost $400, and she responded that she would "either pay me with [the victim's] Dick Butkus football card or she wanted credit." She told him to drop the drugs off at the victim's house and get the money from the victim.

¶ 27     The statement further related that at 10:30 p.m., defendant walked to the victim's house with Stapleton, whom he called "Capone." Defendant had been there many times before with Hayden. When the victim answered and stated that Hayden was not at home, they entered the house and Stapleton "started looking around and picked up a wallet and got $12." Defendant indicated that Stapleton went into the bathroom, and then came out and grabbed the victim around the neck, holding a folding knife, and told the victim that he knew he had money in the house. Defendant indicated that he was "feeding off of Capone" and that he "didn't walk all the way down there in Berwyn carrying drugs for nothing. Cindy had me come down there, and I wanted to get something for it. I started yelling at [the victim] where is the money." Defendant's statement recounted that Stapleton tightened his grip on the victim and defendant "knew he wasn't playing" and defendant started searching the house.

¶ 28     According to defendant's statement, Stapleton ordered the victim to sit down, and then Stapleton lay on top of him with the knife. At one point, the victim tried to "bolt to the door," so defendant blocked him. When the victim tried to punch defendant, defendant told the victim that "he didn't want to do this" to defendant, but the victim "kept coming at" defendant, so defendant put his hand on his throat. The victim struggled, and defendant "hit him with an open left hand across the left side of his face." Defendant called for Stapleton's assistance because the victim "was way too strong" for defendant.

¶ 29     Defendant related that the victim continued to try to reach the door, and defendant smacked him in the face. Stapleton punched the victim a few times and had him sit on the couch. Stapleton asked the victim if he had any tape; they wanted to tape him to prevent his escape or from calling the police. Defendant indicated that "the tape was in the table. Capone called me over and told me he would show me how to tape him up." Further, Stapleton had the duct tape while defendant searched the house looking for money or valuables. Defendant indicated that the victim was still fighting Stapleton, so defendant "held [the victim's] legs while Capone taped them together. [The victim] then put his hands up so Capone taped them together. Capone taped [the victim's] mouth over and over. [The victim] was still trying to talk and mumble." According to the statement, the victim "mumbled, I can't breathe." Defendant indicated that he told Stapleton to remove the tape from the victim's nose, but Stapleton stated, "This is a home invasion. Dead man [*sic*] don't talk." Stapleton taped over the victim's head and entire face, and defendant watched the victim's body "in convulsions." Defendant also found a "big sword in a holder in a closet," which he gave to Stapleton. According to the statement, Stapleton then stabbed the victim in the side with the sword.

¶ 30     Defendant further indicated in his statement that he then left while Stapleton went through kitchen cabinets, made soapy water to wash the victim's face and fingernails, and removed the victim's shoes and put them in a bag. Stapleton put the things they found in the house in a bag, and they left the victim there. Defendant indicated that he knew the victim was dead because he was not moving, even when Stapleton "kicked [the victim] in the balls

and jumped on his chest."

¶ 31 Subsequently, the police also obtained a consent to search from defendant on December 1, 2003, to look for a sword, which was found on the arm of a chair in the living room of his apartment.[3]

¶ 32 Called by the State at trial, Stapleton identified defendant and testified that he met defendant in 2003 and they used to hang out together. However, Stapleton expressly denied that defendant was involved in selling drugs or in the robbery and murder of the victim. Rather, Stapleton essentially testified that he alone was responsible for the crimes and that defendant merely "stood by." Stapleton testified that Hayden owed him, not defendant, the money, and that he was the one who spoke with the victim about the debt and started fighting with him. Stapleton testified that "[e]verything that transpired between the old man was with me and the old man." Stapleton indicated that defendant was "just standing there" as Stapleton stabbed the victim twice, pinned the victim down, and bound him with duct tape. Stapleton indicated that defendant pleaded with him to not hurt the victim anymore, and defendant was shocked, speechless, and "had no knowledge at [*sic*] what I was going to do."

¶ 33 Stapleton testified that he searched the house for money, while defendant stayed in the front of the house and did not take anything. Stapleton denied that defendant suffocated the victim; Stapleton testified that "[e]very action that was took was my doing" and that he was the one holding the victim. Stapleton testified that he also stole the sword, bag of coins, and jewelry, and brought them to defendant's apartment. Stapleton also denied being afraid of defendant.

¶ 34 Regarding the interview with O'Brien on November 30, 2003, Stapleton testified that he told O'Brien "quite a few things" and his "main focus was to get the attention off [him] at the moment." Stapleton denied making the statements to O'Brien that were set forth in the written statement, and he denied giving O'Brien a statement that she reduced to writing that day, although he acknowledged that he signed every page of the written statement, the advice of rights form, and the photograph that was taken of him on that day.

¶ 35 Stapleton also denied speaking with O'Brien and a detective again on December 1, 2003, but he acknowledged that he signed a photograph that was taken of him on that date. He denied telling O'Brien that he wanted to add a few things to his previous statement, and he denied making the statements that were set forth in the December 1 written statement. But Stapleton acknowledged that he was able to review the written December 1 statement and that he signed every page. Stapleton denied telling O'Brien that he was afraid of defendant. Stapleton indicated that, in the statements, he attempted to minimize his involvement in hopes that he would be considered only a witness or receive a reduced charge.

¶ 36 Stapleton testified that on May 12, 2009, he pled guilty to murdering the victim and, at the plea proceeding, the prosecutor read aloud the written statements from November 30 and December 1, 2003. Stapleton acknowledged that, during the proceeding, he was placed under oath and responded that he agreed that the written statements were his statements and that

---

[3]At trial, the victim's son identified the coins and sword, indicating that they belonged to the victim and the victim had kept them in his house.

he was pleading guilty because he was guilty. He also testified that he initially entered into a plea deal with the State wherein he would plead guilty to armed robbery and receive a reduced sentence in exchange for testifying consistently with his written statements, but he ultimately did not proceed with the plea deal. He testified that he "was never afraid" and affirmed that he was a murderer. Stapleton affirmed that when he signed the plea deal in September 2006, and when he later pled guilty to murder in 2009, defendant was not present.

¶ 37    At the close of the State's case, defendant moved for a directed finding, but the motion was denied. The parties agreed to several stipulations, including that no latent prints suitable for comparison were found at the scene and no blood was detected on the sword and its sheath.

¶ 38    On behalf of the defense, Veronica Thomas, defendant's caseworker from the Illinois Department of Children and Family Services, testified that during a well-being visit in August 2003, defendant showed her what looked like 50 cent pieces or gold dollars. He told her that a friend or family member gave them to him. On October 22 or 23, 2003, she was informed that defendant had been arrested. Thomas went to his apartment, to which she had a key, and found it in disarray; the back window was broken and the back door was unlocked. She looked through all the rooms, including the living room, but she never noticed a sword. While she was in the apartment, the police arrived at the back door. She returned to the apartment the next day, but she again did not notice a sword. She never saw any drugs in his apartment.

¶ 39    Kimyona Taylor, an investigator for the Cook County public defender's office, interviewed Hayden with defendant's attorney in March 2009. Taylor testified that Hayden gave them names of several individuals who sold drugs in Berwyn and told them that she owed money to various people for drugs. Taylor also testified that Hayden told them that the police handcuffed her when she was taken to the police station on the morning of October 22, 2003.

¶ 40    During closing argument, the prosecutor asserted that both defendant and Stapleton were responsible for the victim's death because they acted together, Stapleton was afraid of defendant and was "back peddling [*sic*]" at trial in front of defendant, and defendant's own statement to police incriminated him. The defense asserted that no physical evidence implicated defendant, Hayden was a liar and was indebted to more people than just defendant, Hayden was possibly with Stapleton at the victim's house as her blouse was attached to the duct tape, Stapleton implicated defendant in his statements in order to get favorable treatment from the State, and Stapleton was solely responsible for the murder and his trial testimony was the truth.

¶ 41    The trial court instructed the jury on the theory of legal accountability, and the jury found defendant guilty of first degree murder.[4] In defendant's subsequent motion for a new trial,

---

[4]During deliberations, the jurors submitted a question in which they indicated that they were convinced that defendant was present when the murder occurred, that a knife or sword and physical force were used, and that the victim was murdered, but that they did "not know who actually duct taped [the victim]'s face which caused his death." The jurors asked if they could find defendant

which was denied, he argued that the trial court erred in restricting cross-examination of Stapleton regarding the plea deal with the State. On July 7, 2011, the trial court sentenced defendant to 33 years' imprisonment. On August 3, 2011, the trial court denied defendant's motion to reconsider his sentence, and defendant filed a notice of appeal the same day.

¶ 42                                                    ANALYSIS

¶ 43       On appeal, defendant argues that the trial court erred in curtailing defense counsel's cross-examination of Stapleton by prohibiting inquiry into the length of the sentence he would have received under the plea deal for armed robbery, the length of sentence he received for his first degree murder conviction, and whether he rejected the deal because he was not going to testify to his handwritten statement. Defendant has preserved this issue for appellate review because it was presented at trial and contained in his posttrial motion for a new trial. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008).

¶ 44       "The latitude to be allowed on cross-examination rests within the sound discretion of the trial court; a reviewing court should not interfere absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Hall*, 195 Ill. 2d 1, 23 (2000). The admission of evidence also falls "within the sound discretion of a trial court." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The trial court abuses its discretion if its decision is "arbitrary, fanciful or unreasonable," or if "no reasonable person would agree with the position adopted by the trial court." *Id.* Evidentiary error is ultimately deemed harmless "where there is no reasonable probability that the jury would have acquitted the defendant absent" the error. *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). It is also well established that "[t]his court may affirm the judgment of the trial court on any issue appearing in the record, and the State may defend the trial court's ruling 'on any grounds sustained in the record regardless of the reasoning used by the trial court.' " *People v. Tripp*, 306 Ill. App. 3d 941, 952 (1999) (quoting *People v. Kolichman*, 218 Ill. App. 3d 132, 138 (1991)).

¶ 45       A criminal defendant has a constitutional right to confront the witnesses against him. *People v. Triplett*, 108 Ill. 2d 463, 474-76 (1985). A defendant's confrontation rights include the opportunity for "effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotation marks omitted.) *People v. Kirchner*, 194 Ill. 2d 502, 536 (2000). "Cross-examination may concern any matter that goes to discredit, modify, explain or destroy the testimony of the witness." *People v. Truly*, 318 Ill. App. 3d 217, 224 (2000). A defendant is not required to demonstrate that a witness has actually been made a promise of leniency or expects a special favor; "rather, the evidence need only give rise to the inference that the witness has something to gain or lose by testifying." *Id.* at 225-26.

¶ 46       "The trial court's discretionary authority to restrict cross-examination comes into play after the court has allowed sufficient cross-examination to satisfy the confrontation clause."

guilty of a lesser crime. The defense requested that the trial court give a supplemental instruction on conspiracy to commit armed robbery or murder, but the trial court denied the request. The trial court instructed the jury to continue deliberations and that it had "all the evidence and the law."

-10-

*People v. Martinez*, 335 Ill. App. 3d 844, 856 (2002) (citing *People v. Averhart*, 311 Ill. App. 3d 492, 497 (1999)). In evaluating whether the trial court abused its discretion in limiting cross-examination, this court considers "whether the limitation created a substantial danger of prejudice to the defendant by denying the defendant the right to test the truth of the testimony he sought to challenge." *Id.* "[T]he right to cross-examine is satisfied when counsel is permitted to 'expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *Truly*, 318 Ill. App. 3d at 226 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "If the entire record shows that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *Id.* "To determine the constitutional sufficiency of cross-examination, a court looks not to what a defendant has been prohibited from doing, but to what he has been allowed to do." *Id.* at 227-28.

¶ 47    In the present case, defense counsel cross-examined Stapleton regarding the plea deal for armed robbery:

"Q. [Defense counsel:] And the deal was that you testified consistent with the previous statements which you signed, isn't that true?

A. [Stapleton:] Right."

¶ 48    Stapleton identified his signature on a document entitled "pretrial interview agreement regarding Lee Stapleton," and acknowledged that terms of the agreement permitted use of any statements he made during the interview if he later testified inconsistently with those statements.

"Q. [Defense counsel:] So you were agreeing that you were going to testify to what was written by the State's Attorney in this document, isn't that true?

A. [Stapleton:] Right.

Q. And the deal that you got at that time was the first degree murder charge against you would be reduced, correct?

A. Correct.

Q. And it would be reduced to a charge of armed robbery, right?

A. Right.

Q. And your understanding at the time was the first degree murder charge carrying a potential sentence–

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

* * *

Q. [Defense counsel:] Did you discuss the potential penalties with the State's Attorney before you signed the document?

A. [Stapleton:] Right. I was aware.

Q. And when you say you were aware, were you aware of how much time you could

do on a first degree murder charge?

A. Yeah.

Q. And was that 20–

[Assistant State's Attorney]: Objection.

THE COURT: Sustained. Not to be considered. Strike it.

Q. [Defense counsel:] Suffice it to say, if you were charged with the first degree murder, you were going to do a long time in the penitentiary, weren't you?

A. [Stapleton:] Right.

Q. And on the murder charge, you weren't going to get any good time to reduce the sentence, isn't that right?

A. Yeah, that's right.

Q. You would have to do 100 percent of the sentence?

A. Right.

Q. But on the armed robbery charge, that was less time, much less time than you were liable to if you pled to first degree murder, correct?

A. Right.

Q. And the sentence that was agreed upon was 13 years?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained, sustained. Stricken."

¶ 49     Showing Stapleton the plea agreement document, defense counsel asked:

"Q. [Defense counsel:] And I'm on page 2. And doesn't it say that you will be offered a sentence of 13–

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

Q. [Defense counsel:] You were only going to get the benefit of this document if you testified to People's Exhibit 31 [Stapleton's November 30, 2003, statement], isn't that true?

A. [Stapleton:] Right.

Q. *And at some point, you decided not to testify to something that was not true, correct?*

A. *Right.*

Q. And you entered a plea on the charge of first degree murder on May 12th, 2009, right?

A. Right.

Q. And you got the absolute minimum sentence that you could get on a charge of first degree murder, isn't that true?

A. Right.

Q. And the reason you pled guilty to the charge of first degree murder and received

-12-

the minimum sentence was because you were not going to testify to the handwritten document which was prepared by the State's Attorney, People's Exhibit 31?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained." (Emphases added.)

¶ 50 On redirect examination, the following colloquy occurred:

"Q. [Assistant State's Attorney:] Now, you never availed yourself of any deal, right?

A. [Stapleton:] No.

Q. Right?

A. Right.

Q. You could have, but you didn't, right?

A. Right.

Q. And you understood that you could avail yourself of less time, right?

A. Right."

¶ 51 Stapleton denied that, after signing the plea deal, he asked to be moved to a different tier, or that he was threatened, afraid for his life, or afraid for his family.

"Q. [Assistant State's Attorney:] The deal that you were offered was that you tell the truth and you could avail yourself of the deal, right?

A. [Stapleton:] Right.

Q. But you decided not to go through with it, correct?

A. Correct."

¶ 52 On appeal, defendant relies primarily on *People v. Tenny*, 224 Ill. App. 3d 53 (1991), and *People v. Graves*, 54 Ill. App. 3d 1027 (1977), in arguing that counsel's cross-examination was unduly restricted. In *Tenny*, 224 Ill. App. 3d at 63-66, this court held that the trial court improperly restricted the cross-examination of an accomplice where the State informed the jury that two accomplices would plead guilty to murder, but both accomplices testified at trial that they did not intend to plead guilty. The court held that it was error to prohibit defense counsel's inquiry when cross-examining one accomplice as to whether she intended to plead guilty, what her attorney told her regarding any agreement, and what she hoped to gain by testifying. *Id.* at 65-66. The court indicated that an accomplice witness's expectations were probative, the defense was "entitled to inquire about any agreement," and, under the circumstances, the prosecution had a duty to inform the jury of the agreement and its terms *Id.* at 66.

¶ 53 In *Graves*, the court held that the defendant should have been permitted to inquire whether the accomplice could get probation for armed robbery, whether he could get life in prison for armed robbery, and what the accomplice "[was] looking at" if he had not taken the plea deal. *Graves*, 54 Ill. App. 3d at 1033. The accomplice was charged with the same three offenses as the defendant, but he agreed to testify for the State in exchange for pleading guilty only to armed robbery and receiving probation. *Id.* at 1029. The court found that the trial court erred, although the error did not require reversal given the other evidence against the defendant. *Id.* at 1033. The court indicated that "[w]here an accomplice is testifying in

-13-

return for receiving lenient treatment, the nature and extent of the leniency are appropriately considered in determining the credibility of the witness' testimony." *Id.*

¶ 54 Although defendant urges that the principle involved in *Graves* and *Tenny* should apply to the present circumstances, we disagree. *Tenny* involved a prospective plea agreement in which an accomplice hoped to gain favorable treatment in exchange for testifying, and the potential plea and terms of the agreement, if any, were to be definitively determined after the defendant's trial. In contrast, Stapleton's plea deal was not pending at the time of defendant's trial. At the time Stapleton testified, he had already made the decision not to take the deal offered, and instead pled guilty to first degree murder, home invasion, and armed robbery. We find this to be a significant distinction from the circumstances in *Tenny*. The accomplice in *Tenny* was still potentially hoping to gain favorable treatment by testifying against the defendant. Because Stapleton had been convicted and sentenced before defendant's trial, there were no similar concerns at stake. Accordingly, the court's reasoning in *Tenny* that what an accomplice "hoped to gain" by testifying is inapplicable to the present circumstances.

¶ 55 Unlike in *Graves*, the accomplice in the present case did not ultimately accept the plea deal offered by the prosecution. *Graves*, 54 Ill. App. 3d at 1033. Therefore, the underlying premise of *Graves* is inapposite to the instant case. That is, Stapleton was not "an accomplice *** testifying in return for receiving lenient treatment"; accordingly, there was no "nature and extent of the leniency" to consider in assessing Stapleton's credibility. He did not go through with the plea agreement and there is no indication from the record that he otherwise received any agreement or favorable treatment regarding his guilty pleas to first degree murder, home invasion, and armed robbery.[5]

¶ 56 Initially, we note that prior to trial, the State presented a motion *in limine*, requesting that the trial court prohibit defendant from introducing evidence or argument regarding "any possible punishment that the defendant will receive if convicted of the charge before this Court." The trial court granted the motion, without objection. We also note here that even though defendant was precluded from eliciting the specific sentences that Stapleton was offered and that he received, the jury was informed that he was offered the opportunity to plead guilty to a reduced charge for a term of years significantly less than he faced.

¶ 57 In *People v. Brewer*, 245 Ill. App. 3d 890, 892-93 (1993), the court "decline[d] to follow *Graves* to the extent that it may conflict with" cases in which the trial court was found to have properly precluded any inquiry into an accomplice's specific sentence "when such disclosure would also reveal the potential sentence facing the defendant," and thereby

---

[5]Defendant also cites *People v. Collins*, 106 Ill. 2d 237, 268 (1985), and *People v. Santiago*, 409 Ill. App. 3d 927, 934 (2011). We note that these cases are likewise distinguishable from the present circumstances. The *Collins* court found no error in the introduction of the State's evidence that the testifying accomplice agreed to testify in exchange for three years in protective custody (implying that the defendants were dangerous). *Collins*, 106 Ill. 2d at 268. In *Santiago*, the court found no substantial prejudice in the State's reference to the length of the sentences received by the codefendants, as this was introduced to rebut the codefendants' assertion that they pleaded guilty in order to get out of Cook County jail. *Santiago*, 409 Ill. App. 3d at 928-37.

prejudice the State's right to a fair trial. Such evidence is properly excluded "in cases where the record shows that the defendant was able to conduct an extensive inquiry into the nature of the plea agreement with the State." *Id.* at 893. In *Brewer*, one codefendant testified that his agreement called for the State's recommendation of a 20-year prison term, but the trial court did not abuse its discretion in prohibiting inquiry regarding the potential 90-year prison term he would have otherwise faced. *Id.* at 891-92. See also *People v. Pettis*, 184 Ill. App. 3d 743, 752-53 (1989) (finding no error where the trial court precluded the defendant from inquiring into the potential sentences of the offense the State dropped and the offense to which the accomplice pleaded guilty in exchange for testifying because the defendant was otherwise allowed to expose potential bias in eliciting that the accomplice pleaded guilty to a lesser charge in exchange for testifying).

¶ 58        As in *Brewer*, the trial court here did not abuse its discretion in preventing inquiry into the specific sentence for first degree murder considering that defendant was facing the same charge as Stapleton. *Brewer*, 245 Ill. App. 3d at 892-93. Similarly, informing the jury of the specific sentence that Stapleton was offered for the reduced charge of armed robbery would have violated the court's ruling on the State's motion *in limine* by giving the jury a frame of reference with which to discern that defendant was facing at least that many years for the greater charge of murder. As noted, adequate information regarding the details of Stapleton's failed plea deal was otherwise disclosed to the jury to satisfy defendant's confrontation rights. *Id.* The jury heard that Stapleton was aware of the potential penalties he faced, that the murder charge involved "a long time in the penitentiary" and he would have had to serve the entire sentence, that the armed robbery charge involved "much less time," and that he received the minimum sentence possible for first degree murder.

¶ 59        Defendant essentially asserts that Stapleton's in-court testimony was more believable because of his prior refusal to go through with the plea deal in which he agreed to testify consistently with his earlier statements. In effect, defendant's argument constitutes an attempt to bolster a witness's in-court testimony by disclosing a prior consistent position. Prior consistent statements are generally inadmissible to corroborate a witness's trial testimony. *People v. Maldonado*, 398 Ill. App. 3d 401, 422 (2010). Prior consistent statements unfairly enhance the credibility of a witness "because a jury is more apt to believe something that is repeated." *Id.*

¶ 60        Defendant has presented no authority which holds that a witness's testimony may be bolstered by the fact that he refused to plead guilty in exchange for a plea agreement. We decline to hold that such circumstances are probative of credibility. Indeed, there are a myriad of reasons for not accepting a deal, or why an accomplice would refuse to testify for the State and implicate the defendant. Paramount is the reluctance of a prisoner to testify against another prisoner and avoid being labeled as a "snitch" in the prison community.

¶ 61        Additionally, defendant argues that when Stapleton was asked why he refused the plea deal, the State's objection was erroneously sustained. First, it must be noted that defendant suffered no prejudice because Stapleton was permitted to testify as follows:

        "Q. [Defense counsel:] You were only going to get the benefit of this document if you testified to People's Exhibit 31 [Stapleton's November 30, 2003, statement], isn't

that true?

A. [Stapleton:] Right.

Q. *And at some point, you decided not to testify to something that was not true, correct?*

A. *Right.*" (Emphases added.)

¶ 62 Second, the objection was properly sustained. Stapleton's reasons for refusing to accept the plea deal are of no relevance to any issue in the case. Rather, the relevant evidence is Stapleton's denials of the truth of the statements he gave to O'Brien and his contention that he was solely responsible for the murder. He had an opportunity to testify to that under oath, and he did so; the jury just did not believe him. Eliciting his reasons why he refused to accept the plea deal was merely an attempt to improperly bolster his well-developed in-court testimony, and it was not an abuse of discretion to sustain an objection to it.

¶ 63 Based on this record, the trial court did not abuse its discretion in curtailing the cross-examination. *Hall*, 195 Ill. 2d at 23. The record demonstrates that the jury was "made aware of adequate factors concerning relevant areas of impeachment" of Stapleton (*Truly*, 318 Ill. App. 3d at 226) and the trial court's limitation did not create "a substantial danger of prejudice" to defendant (*Martinez*, 335 Ill. App. 3d at 856). Considering the State's interest in obtaining a fair trial, defendant's confrontation rights, and the information regarding the plea agreement that was disclosed, the record supports that the trial court struck a reasonable balance between the parties' competing interests.

¶ 64 Even assuming that it was error to limit the cross-examination in this regard, in light of the fact that the jury was adequately informed of the circumstances of the failed plea deal and that Stapleton decided not to testify to his November 30, 2003, written statement because it "was not true," any error was harmless beyond a reasonable doubt, as it did not affect the jury's verdict.

¶ 65                                          CONCLUSION
¶ 66 For the reasons stated above, we affirm defendant's conviction and sentence.

¶ 67 Affirmed.